REVISED OCTOBER 2, 2007

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

Nos. 06-30120 c/w 06-30299

_____

**United States Court of Appeals
Fifth Circuit**

**F I L E D**

September 13, 2007

Charles R. Fulbruge III
Clerk

H.S. STANLEY, JR., in his
capacity as Trustee of the
Bankruptcy Estate of Gary Eugene Hale,

Plaintiff-Appellant,

versus

CLARE W. TRINCHARD, ETC., ET AL.,

Defendants,

CLARE W. TRINCHARD, ESQ.,
TRINCHARD & TRINCHARD LLC,
LEIGH ANN SCHELL; CLARENDON
NATIONAL INSURANCE CO.,

Defendants-Appellees.

*********************************************************************

H. S. STANLEY, JR., in his
capacity as Trustee of the
Bankruptcy Estate of Gary Eugene Hale,

Plaintiff-Appellant,

versus

CLARE W. TRINCHARD, ETC., ET AL.,

Defendants,

NORTHWESTERN NATIONAL INSURANCE
COMPANY OF MILWAUKEE, WISCONSIN,

Defendant-Appellee.

---------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
---------------------

Before KING, WIENER, and OWEN, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant H.S. Stanley, trustee for the bankruptcy estate of Gary Eugene Hale, appeals from separate orders of the district court granting summary judgments (1) for Defendants-Appellees Clare Trinchard, Trinchard & Trinchard LLC, and their errors and omissions insurer, Clarendon National Insurance Company ("the Trinchard defendants"), on the estate's legal malpractice claim, and (2) for Hale's erstwhile liability insurer, Defendant-Appellee Northwestern National Insurance Company (NNIC), on the estate's claim for breach of the duty of good faith and fair dealing. Stanley contends that the district court erred in ruling that (1) Hale's bankruptcy discharge eliminated any compensable damages that may have resulted from the Trinchard defendants' alleged malpractice, and (2) Stanley failed to allege conduct by NNIC that would constitute a breach of an insurer's duty of good faith and fair dealing

2

under Louisiana law.  We reverse and remand for proceedings consistent with this opinion.

## I.  FACTS & PROCEEDINGS

### A.    Background

The instant case stems from the criminal investigation and prosecution of Gerald Burge for the murder of Douglas Frierson in 1980.  Burge was indicted for and convicted of Frierson's murder based in part on an investigation conducted by Hale when he was a detective in the St. Tammany Parish (Louisiana) Sheriff's Office ("the Sheriff's Office").[1]  Several years after Burge was convicted, however, potentially exculpatory evidence was discovered (specifically, several of Hale's investigative reports) that had not been disclosed to the defense at or before Burge's trial.  Burge was granted a new trial, which resulted in his acquittal on all charges.

While awaiting his new trial, Burge had filed a § 1983 civil suit ("the Burge litigation") against (1) the Sheriff's Office, (2) the St. Tammany Parish District Attorney's Office, and (3) various individuals within each agency, including Detective Hale, for conspiring to deprive Burge of his right to a fair trial by suppressing exculpatory evidence.[2]  Burge later added NNIC as a

---

[1] Hale ended his employment with the sheriff's office sometime in the summer of 1981.

[2] Burge's claims against the District Attorney's Office and individual prosecutors were dismissed on the basis of prosecutorial immunity.  Burge v. Parish of St. Tammany, 1994 WL

defendant for its role as the liability insurer of the Sheriff's Office during the first few years of the Frierson murder investigation.

B.    NNIC's Insurance Coverage

In 1980, American Druggists' Insurance Company (ADIC) issued a liability insurance policy ("the original ADIC Policy") to the Louisiana Sheriffs Association.[3]  This policy was renewable for 12-month terms and (if renewed) would remain in effect until September 1, 1983.  It specified a coverage limit of $100,000 per occurrence.[4]  ADIC subsequently issued an amended policy ("the amended ADIC Policy"), which restated the same terms and coverage period as the original ADIC Policy but increased the coverage limit to $1,000,000.  The original ADIC Policy was marked "cancelled flat."  The amended ADIC Policy indicated in a notation on the Declarations Page and in an amending endorsement that the effective date for the new $1,000,000 coverage limit was September 1, 1981, not the original commencement date of September 1, 1980. When  ADIC  became  insolvent  in  1986,  its  reinsurer,  NNIC,  assumed

---

86694 (E.D. La. Mar 9, 1994), aff'd on other grounds, 187 F.3d 452 (5th Cir. 1999).  Burge voluntarily dismissed the Sheriff's Office as a defendant early in the case, but continued to pursue his claims against the Sheriff in his official capacity.

[3] The "Named Insureds" under the ADIC Policy were "each Sheriff [and his employees] of the Parishes of the State of Louisiana."

[4] For the purposes of this opinion, "coverage limit" will consistently refer to coverage limit per occurrence.

responsibility for any coverages under the ADIC policies pursuant to a "cut-through" reinsurance endorsement.[5]

In the Burge litigation, NNIC filed a motion for summary judgment seeking dismissal, because the ADIC policies' coverage ended on September 1, 1983, and Burge's alleged injury did not "occur" until he was indicted in November 1983, or possibly until he was convicted in 1986. NNIC also asked the court to rule that the coverage limit applicable to any misconduct by Hale was $100,000, as specified in the original ADIC Policy, because his employment with the Sheriff's Office ended in the summer of 1981, before the $1,000,000 coverage limit in the amended ADIC Policy went into effect on September 1 of that year.

The district court denied NNIC's motion, ruling that the issues raised by NNIC were "hotly disputed" and worthy of full development at trial.[6] The coverage issue centered on whether the ADIC policies' definition of a covered "occurrence" was broad enough to encompass all conduct related to the Frierson murder investigation, including both Hale's actions while he was employed as a detective with the Sheriff's Office and his post-employment conduct during Burge's murder trial in 1986. The coverage limit issue concerned, inter alia,

---

[5] "[A] 'cut-through' clause is any term within a reinsurance agreement under which the reinsurer assumes liability towards the original insured in the event of the liquidation of the reinsured." Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 9:16 (3d ed. 2006).

[6] The same district judge presided over both the Burge litigation and the instant case.

5

whether (1) marking the original ADIC Policy "cancelled flat" indicated an intention to make the terms of the amended ADIC Policy effective retroactively,[7] or (2) the Louisiana Sheriffs Association had intended for the original ADIC Policy to provide a $1,000,000 coverage limit.[8]

C.    NNIC's Settlement with Burge

NNIC initially retained attorney Clare Trinchard to determine whether the ADIC policies provided coverage for the alleged misconduct of the Sheriff and his personnel.   After receiving her review of the case, NNIC retained the Trinchard firm to represent the Sheriff, Hale, and NNIC in the Burge litigation. Later, after deciding to dispute coverage under the ADIC policies, NNIC instructed the Trinchard firm to continue representing the Sheriff and Hale individually but retained separate counsel to represent NNIC's interests.

In November 2000, shortly before the Burge litigation was to be tried, the Trinchard firm and NNIC's counsel negotiated a partial settlement with Burge. In exchange for $75,000, Burge agreed to (1) release NNIC fully from all liability under the ADIC policies and (2) release the Sheriff and Hale from liability,

---

[7] "Cancelled flat" is a term of art essentially meaning "void ab initio."   See, e.g., Highlands Ins. Co. v. Hobbs Group, LLC, 373 F.3d 347, 350 n.4 (3d Cir. 2004) (discussing effect of "flat" cancellation of a surety bond); Escobedo v. Estate of Snider, 930 P.2d 979, 985 (Cal. 1997) ("[A]ccording to insurance industry usage, a "cancellation" may under some circumstances be made "flat," meaning effective from the policy's inception, eliminating liability for either premiums due or losses incurred in the interim.").

[8] All of these coverage/coverage limits issues were set out  in a July 2000 letter to NNIC from its counsel.

except for punitive damages, for any conduct that occurred during the ADIC policies' coverage period (September 1, 1980 to September 1, 1983). Burge expressly reserved his right to pursue claims against the Sheriff and Hale for conduct that occurred outside of the coverage period as well as for punitive damages at any time.

In January 2001, on the advice of the Trinchard defendants, Hale consented to the Burge settlement and signed a separate "Release and Acknowledgment" absolving that firm's former client, NNIC, from "any and all liability" under the ADIC policies, including "claims for indemnification, defense, legal fees and costs, [and] bad faith." The release itself did not specify the terms of the Burge settlement, particularly Burge's reservation of his right to sue Hale for conduct occurring outside of the ADIC policies' coverage period. After obtaining Hale's release of NNIC, the Trinchard defendants terminated their representation of Hale and the Sheriff.

D.    The Burge Trial and Hale's Bankruptcy Proceedings

Burge's remaining claims against the Sheriff and Hale were tried in May 2001. The Sheriff was represented by other counsel, but Hale decided to represent himself, possibly believing that the only liability he faced post-settlement was for punitive damages, which he believed to be, at most, a remote possibility. After a jury verdict for Burge, the court entered judgment against

7

the Sheriff and Hale, awarding Burge more than $4,000,000 in compensatory damages. The Sheriff appealed to this court, and we reversed the judgment against him. Hale, still unrepresented by counsel, did not appeal. The judgment against Hale became final in September 2001.

The following month, Burge forced Hale into involuntary bankruptcy in Mississippi. As the appointed trustee of Hale's bankruptcy estate, Stanley filed the instant action against the Trinchard defendants[9] and NNIC in the district court in April 2002, alleging that (1) the Trinchard defendants were negligent in their representation of Hale and (2) NNIC breached its fiduciary duty of good faith and fair dealing in its settlement of the Burge litigation. Hale was discharged in the bankruptcy proceeding in December 2002, and neither Stanley as trustee nor Burge as Hale's only creditor contested the discharge.

E.   District Court Proceedings

The Trinchard defendants and NNIC each filed a motion for summary judgment in the district court. The court granted both motions, concluding that (1) Hale's bankruptcy discharge made it impossible for Stanley to show that any damages resulted from the Trinchard defendant's alleged malpractice and (2) Stanley did not allege conduct by NNIC that would constitute a breach of the

---

[9] Stanley later added as a defendant Leigh Ann Schell, an attorney employed by Trinchard & Trinchard during the Burge litigation. The district court dismissed all claims against Schell as time-barred, and Stanley does not challenge that ruling.

8

insurer's duty of good faith and fair dealing under Louisiana law.  On appeal, Stanley contends that the district court based these rulings on erroneous interpretations of the controlling law.

## II.  ANALYSIS

A.    Legal Malpractice Claim

1.    Standard of Review

We review a district court's summary judgment ruling de novo, applying the same standard as the district court.[10]

2.    Merits

Federal bankruptcy law determines the extent of a debtor's bankruptcy estate.[11] Such an estate comprises all "legal or equitable interests [of the debtor] in property as of the commencement of the [bankruptcy] case," which includes any "causes of action belonging to the debtor at the time the case is commenced."[12]  "A debtor's pre-petition rights in property, such as a cause of action, are determined according to state law."[13]  The trustee of a debtor's bankruptcy estate may pursue any claims that are property of the bankruptcy

---

[10] Curtera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 110 (5th Cir. 2005).

[11] See In re Segerstrom, 247 F.3d 218, 223 (5th Cir. 2001) (citing United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05 (1983).

[12] Id. (citing 11 U.S.C. § 541(a)(1) and La. World Exposition v. Fed. Ins. Co., 858 F.2d 233, 245 (5th Cir. 1988)).

[13] Id. at 224.

estate.[14]  As such, the trustee "is subject to all defenses available against the debtor, and must prove all elements that the debtor herself would be required to prove."[15]

In this case, the record makes clear that a cause of action against the Trinchard defendants for legal malpractice, if cognizable, accrued to Hale no later than September 2001, when the judgment against him became final and Burge's attorney suggested to Hale that he might have a viable malpractice claim.[16]  As Hale was forced into bankruptcy in October 2001, his potential malpractice claim had accrued prior to the commencement of his bankruptcy proceedings and thus (1) became part of his bankruptcy estate, and (2) could be asserted by Stanley as trustee of Hale's bankruptcy estate.  The district court acknowledged these facts, but ultimately concluded that Stanley's legal

---

[14] 11 U.S.C. § 323; Wieburg v. GTE Southwest Inc., 272 F.3d 302, 306 (5th Cir. 2001) ("Because the claims are property of the bankruptcy estate, the Trustee is the real party in interest with exclusive standing to assert them.").

[15] Segerstrom, 247 F.3d at 224.

[16] In their summary judgment motion, the Trinchard defendants contended that Stanley's malpractice claim is time-barred under the  one-year prescriptive period for such actions set forth in La. Rev. Stat. § 9:5605, because Hale was aware of the allegedly negligent acts by the Trinchard defendants more than one year prior to Stanley's filing suit.  In his response to the summary judgment motion, Stanley argued that (1) Hale did not become aware of the Trinchard defendants' malpractice until he met with Burge's attorney in September 2001, and (2) he was not injured by that malpractice until the judgment against him became final that same month.  The district court concluded that genuine factual issues existed as to the  actual date the malpractice claim accrued to Hale, and we do not purport to resolve those issues on appeal.  We simply recognize that, by all accounts, the legal malpractice claim against the Trinchard defendants accrued to Hale no later than September 2001.

10

malpractice claim against the Trinchard defendants was not cognizable under Louisiana law, not because it was prescribed but because Hale's bankruptcy discharge eliminated any compensable damages that may have resulted from the Trinchard defendants' allegedly negligent representation.

      a.     McClarty v. Gudenau

We first address the Trinchard defendants' request that we apply the holding of a Michigan Bankruptcy Court in McClarty v. Gudenau.[17] In McClarty, a Chapter 7 trustee brought a legal malpractice suit against an attorney who had represented the debtor in a lawsuit stemming from a pre-petition car accident. The malpractice suit alleged that the attorney's negligence caused the debtor to incur a judgment in excess of her insurance policy limits.[18] The trial court found that "[the trustee] will be unable to prove damages in the amount of the excess judgment because the Debtor, in whose shoes [the trustee] stands, no longer owes this debt as a result of her discharge."[19] The court based its ruling on the interrelation of Bankruptcy Code § 524(a),[20] which states that "[a] discharge . . . voids any judgment at the time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect

---

[17] 176 B.R. 788 (E.D. Mich. 1995).

[18] Id. at 789-90.

[19] Id. at 790.

[20] 11 U.S.C. § 524(a).

to any debt discharged," and the well-settled rule that "when a trustee assumes a debtor's cause of action, he 'obtains rights of action belonging to the bankrupt subject to the same defenses or limitations that a defendant might have asserted against the bankrupt himself.'"[21]  The McClarty court concluded that a trustee of the bankruptcy estate of a discharged debtor could not overcome the defense that the debtor suffered no damages as a result of the purportedly negligent attorney's actions.

The district court declined to apply McClarty in this case, however, recognizing that our decisions in In re Edgeworth[22] and In re Segerstrom[23] established that a bankruptcy discharge eliminates only the debtor's personal liability and not the debt itself.  Accordingly, the court ruled that summary judgment for the Trinchard defendants "based on Hale's discharge" was not warranted.  We agree with that ruling.

In Segerstrom, a Chapter 7 trustee brought suit against a debtor's attorney for legal malpractice and against the debtor's liability insurer for breach of fiduciary duty and breach of contract.[24]  The district court, citing McClarty,

---

[21]  McClarty, 176 B.R. at 790 (quoting In re Giorgio, 862 F.2d 933, 936 (1st Cir. 1988) (emphasis added)).

[22] 993 F.2d 51 (5th Cir. 1993).

[23] 247 F.3d 218 (5th Cir. 2001).

[24] Id. at 221.

granted summary judgment to the attorney on the legal malpractice claim, reasoning that the trustee could not prove any compensable damages, because the debtor's personal liability had been discharged.[25]  Although we affirmed summary judgment on other grounds, we expressly refused to adopt the district court's holding based on McClarty:

> [T]he district court determined that [the trustee] would be unable to prove any damages because Segerstrom's personal liability to the [judgment creditors] had been discharged. [citing McClarty]. We do not adopt the district court's holding.  In In re Edgeworth, this Court held that a discharged debt "continues to exist" and judgment creditors "may collect from any other source that may be liable." We noted in Edgeworth that the bankruptcy code's fresh start policy was not intended to allow insurers to escape obligations simply based on the "financial misfortunes of the insured."  Though Edgeworth does not control the present case . . . its rationale could be extended to include cases like this one. [I]t makes little sense to allow those who have committed torts to escape liability because of the financial misfortunes of their victims.  Moreover, allowing a cause of action to go forward on the facts of this case would not threaten financial harm to the debtor, thus the primary purpose behind the discharge would be protected.[26]

The Trinchard defendants insist that even though the Segerstrom court endorsed the rationale of Edgeworth, that rationale does not apply to the facts of this case, because (1) Edgeworth involved a nominal suit against the debtor to recover from the debtor's liability insurer; (2) the liability insurer in

---

[25] Id. at 223.

[26] Id. at 225 n.4 (internal citations omitted).

Edgeworth was contractually obligated to make a payment for the injury, so the liability proceeds were not a part of the insurance policy and not subject to the discharge; and (3) the plaintiffs in Edgeworth were relatives of the deceased patient, not the trustee of the debtor's bankruptcy estate.

That the facts of the instant case thus differ from those operative in Edgeworth is of no moment here. As the district court recognized, Segerstrom presented facts "on all four corners" with the instant case, and we acknowledged that Edgeworth was not directly controlling precedent.[27] We also acknowledged in Segerstrom, however, that the rationale for Edgeworth's holding could properly be extended to cases such as this one. We accept that we are not bound, in the strictest sense, to follow the path laid out in Segerstrom, but we see no compelling reason not to do so. We remain convinced that (1) it would be improper to excuse the malpractice liability of a potentially negligent attorney because of the "financial misfortunes" of his client/tort victim; and (2) allowing a legal malpractice cause of action to go forward despite the purported tort victim's bankruptcy discharge would not threaten "the primary purpose behind the discharge," i.e, avoiding financial harm to the debtor.[28] Accordingly, we reject the rationale of McClarty and hold that Stanley, as trustee for Hale's

----

[27] Id.

[28] Id.

14

bankruptcy estate, is not barred by Hale's bankruptcy discharge from asserting a legal malpractice claim that had accrued to Hale before commencement of his bankruptcy proceedings.

### b. Louisiana Law

Even though the district court rejected McClarty and accepted Segerstrom as controlling, it nevertheless granted the Trinchard defendants' motion for summary judgment "pursuant to Louisiana law," expressing reasons that we cannot distinguish from those employed by the court in McClarty. This was error.

Under Louisiana law, a plaintiff asserting a legal malpractice claim must prove "(1) the existence of an attorney-client relationship; (2) negligent representation by the attorney; and (3) loss caused by that negligence."[29] The district court recognized that Hale and the Trinchard defendants had an attorney-client relationship and that a genuine issue of material fact existed as to whether the Trinchard defendants represented Hale negligently. The court ruled, however, that Stanley could not prove the third element of legal malpractice, i.e, that the Trinchard defendants' allegedly negligent representation caused Hale any loss or damage. Specifically, the court determined that, as Hale's bankruptcy discharge extinguished his personal

---

[29] See Costello v. Hardy, 864 So.2d 129, 138 (La. 2004) (citations omitted).

15

liability for the judgment debt and Stanley offered no evidence that Hale "had any additional assets that he lost, or that he was forced to make any payments to Burge," Stanley could not show "that Hale suffered any monetary or economic loss at all as the result of the settlement between Burge and NNIC prior to the trial, or Burge's judgment against him as a result of the trial, or the failure to appeal that judgment." Thus, like the McClarty court, the district court here failed to distinguish between Hale individually and his bankruptcy estate —— the very distinction that underpins Segerstrom.

In reaching this conclusion, the district court relied in part on the Louisiana Supreme Court's decision in Costello v. Hardy.[30] In Costello, the plaintiff alleged that the defendants committed legal malpractice by failing to include a provision establishing an annual income for her in her son's will. The plaintiff had earlier filed a nullity action in her son's succession proceedings, alleging that the will was invalid. The plaintiff eventually dismissed the nullity action in exchange for a $25,000 annual stipend from her deceased sons's estate. Following this settlement, the trial court dismissed the legal malpractice action, reasoning that, because the settlement reached in the nullity action provided the plaintiff with the same economic benefit that she would have received had her son's will included the omitted provision, the plaintiff could no longer show that

---

[30] Id.

she suffered any damages from the defendants' alleged malpractice.  The state appellate court affirmed the trial court's ruling on this issue, as did the Louisiana Supreme Court, which held that "[b]ecause Mrs. Costello asserts claims for damages against the attorneys in this malpractice action that were discharged in the settlement of the suit against the Succession, the defendants are entitled to judgment as a matter of law dismissing the plaintiff's malpractice claim."[31]

Costello is distinguishable from the instant case for one obvious reason: Unlike the plaintiff in Costello, Hale never asserted a legal malpractice claim. In Costello, once the nullity action was settled, the plaintiff could no longer show that she suffered damages from the defendants' actions and was therefore unable to make out her malpractice case.  In contrast here, Hale's accrued but unasserted malpractice claim automatically devolved to his bankruptcy estate when involuntary bankruptcy proceedings were commenced in October 2001. At that point, Stanley, as trustee of the estate for the benefit of its creditors, became responsible, ipso facto, for satisfying that judgment, to the extent possible from the property of Hale's bankruptcy estate; and Hale's inchoate legal malpractice claim against the Trinchard defendants was property of the estate.[32]

---

[31] Id. at 139.

[32] See 11 U.S.C. § 704 ("Duties of Trustee").

The fact that Hale was later discharged from personal liability for his judgment debt had no legal effect on Stanley's right and duty to continue pursuing that claim on behalf of the bankruptcy estate.

In relying on Costello, the district court seems to have misapprehended the effect of the rule establishing that a debtor's bankruptcy estate includes any causes of action that had accrued to him as of the time the bankruptcy case has commenced.[33] Adherence to this rule requires that our assessment of the estate's malpractice claim focus only on Hale's financial condition at the instant bankruptcy proceedings were initiated. The record makes clear that, when Hale's bankruptcy proceedings commenced, he was a multi-million dollar judgment debtor, but he had not paid any portion of that debt. If Hale's unpaid judgment debt was the result of compensable malpractice, however, the cause of action to recover damages from the tortfeasors devolved to the bankruptcy estate immediately on the initiation of Hale's bankruptcy proceedings in October 2001. Hale's subsequent discharge from personal liability through the bankruptcy proceedings is irrelevant.

c.    Judgment Rule

---

[33] See 11 U.S.C. § 541(a)(1).

The parties disagree, however, as to whether, in and of itself, Hale's unpaid judgment debt constituted a compensable legal injury. Stanley urges us to apply the "judgment rule," which states that "entry of an adverse judgment is sufficient injury for a legal malpractice action, whether or not any money has been paid or whether or not the judgment is collectable."[34] Stanley points to numerous cases applying the judgment rule and rejecting the "payment rule," which provides that a plaintiff suffers no damage until he actually pays all or part of a judgment allegedly caused by legal malpractice.[35] Stanley acknowledges that no Louisiana or Fifth Circuit case specifically addresses this issue in the legal malpractice context, but he urges us to apply the reasoning of Wooten v. Central Mutual Insurance Co.[36] to the instant case.

In Wooten, a bankruptcy debtor had been involved in a pre-petition car accident that resulted in a $15,000 judgment against him.[37] His liability insurer was responsible only for $5,000, the policy limit.[38] The trustee of the debtor's bankruptcy estate filed suit against the liability insurer for violating the duty

---

[34] See Jacobson v. Haugen, 529 N.W.2d 882, 884 (N.D. 1995).

[35] See Monfort v. Jeter, 567 S.W.2d 498 (Tex. 1978); Shipman v. Kruck, 593 S.E.2d 319 (Va. 2004); Pickens Barnes & Abernathy v. Heasley, 328 N.W.2d 524 (Iowa 1983); Robuck v. Stuart, 544 A.2d 808 (Md. Ct. Spec. App. 1988); Jacobson, 529 N.W.2d 882.

[36] 182 So. 2d 146 (La. App. 3d Cir. 1966).

[37] Id. at 147-48.

[38] Id. at 148.

19

of good faith and fair dealing by failing to settle the tort claim against the debtor within policy limits.[39] The trial court dismissed the suit, holding that the debtor suffered no damages, because he had not paid any part of the excess judgment against him.[40] The key issue on appeal was "whether the trustee may enforce the [debtor]'s cause of action for damages caused by another's breach of duty, when the bankrupt had not actually paid the loss caused by the breach."[41] The cognizant state Court of Appeal reversed, holding that "one damaged through another's breach may recover for breach-caused loss for which he is liable to a third person . . . whether or not the damaged person has actually paid the loss incurred by reason of the breach."[42]

The Trinchard defendants contend that Wooten is inapposite here, because (1) it involved indemnity by an insurance company and not legal malpractice, and (2) the debtor in Wooten had not been discharged from liability on the judgment. The Trinchard defendants add that neither had the debtors in the other "judgment rule" cases cited by Stanley been discharged from the judgments against them. Stanley responds that our acceptance of the Trinchard

---

[39] Id.

[40] Id. ("Damages, if any, will occur only when [the debtor] pays the judgment . . . in excess of [the liability insurer's] limits.")(quoting from trial court's order and reasons).

[41] Id. at 147.

[42] Id. at 149-50 (citations omitted).

defendants' position would produce an unacceptably anomalous result in legal malpractice cases: A client who is able to pay a judgment resulting from his lawyer's malpractice and avoid bankruptcy may recover against the negligent lawyer, but the same negligent lawyer will escape liability if his client cannot pay and therefore must seek bankruptcy protection (or is forced into bankruptcy).

We first address the Trinchard defendants' effort to distinguish the judgment-rule cases cited by Stanley from the instant case on the basis of Hale's discharge from personal liability for the judgment against him. That distinction is irrelevant to our analysis, which must focus only on the injury that Hale had suffered at the time bankruptcy proceedings commenced. If the adverse judgment against Hale amounted to a compensable legal injury at the time the bankruptcy proceedings commenced, Stanley may pursue a legal malpractice claim on behalf of Hale's bankruptcy estate, regardless of Hale's subsequent discharge.

Like Stanley, we recognize that Louisiana courts have not addressed the judgment rule in the context of a legal malpractice claim, but that lacuna does not compel our rejection of the rule here. As no Louisiana case is directly on point, we must make an "Erie-guess" and predict how a Louisiana court would

rule.[43]  In doing so, we may consult a variety of sources, including the general rule on the issue, and the rules in other states.[44]  Having now considered (1) the "general rule" evident from Louisiana court decisions in contexts other than legal malpractice, (2) decisions from other jurisdictions, and (3) general policy concerns, we predict that Louisiana would be more likely to follow the judgment rule than the payment rule when faced with a legal malpractice case like this one.

We reach this conclusion for several reasons.  First, we note the Wooten court's adherence to the "general rule" that an injured plaintiff may seek to "recover for breach-caused loss for which he is liable to a third person . . . whether or not the damaged person has actually paid the loss incurred by reason of the breach."[45]  We see Louisiana's acceptance of this rule not only in Wooten, but also in cases allowing plaintiffs to pursue claims for property damage, albeit they have made no repairs;[46] likewise for medical payments when no such

---

[43] See Hill v. London, Stetelman, & Kirkwood, Inc., 906 F.2d 204, 207 (5th Cir. 1990).

[44] Id.

[45] Wooten, 182 So. 2d at 149; see also Smith v. Audubon Ins. Co., 595 So.2d 1221, 1224 (La. App. 3d Cir. 1992)

[46] See Hughes v. New Orleans Public Service, Inc., 485 So.2d 642, 643 (La. App. 4th Cir. 1986).

payments have been made.[47]  In a broader sense, Louisiana courts routinely apply this "general rule" in the form of the "collateral source rule," which allows tort plaintiffs to seek recovery of the full amount of the losses they have incurred, even when those losses have been completely offset by payments or benefits received from third parties.[48]

We note further that both the Texas and Virginia supreme courts have adopted the judgment rule in the legal malpractice context.  In Montfort v. Jeter, the Texas Supreme Court held that "a judgment injures [the plaintiff] while it remains unpaid. His credit is affected. A lien attaches to his land. His non-exempt property is constantly subject to sudden execution and forced sale. He is entitled to relief from harm if it is the fault of the tortfeasor."[49]  Likewise, in Shipman v. Kruck, the Virginia Supreme Court overruled its prior decisions adhering to the "payment rule" and recognized that "a client who suffers the entry of a judgment against him indeed suffers a legal injury or damage" sufficient to support a legal malpractice claim.[50]  Virginia's highest court

---

[47] See Edwards v. St. Francis Medical Center, 623 So. 2d 1387, 1389 (La. App. 2d Cir. 1993) (citations omitted); Spizer v. Dixie Brewing Co., 210 So. 2d 528, (La. App. 4th Cir. 1968).

[48] See Bozeman v. State, 879 So.2d 692, 697-99 (La. 2004) (discussing the origin of the collateral source rule and the history of its adoption in Louisiana).

[49] 567 S.W.2d at 499 (quoting Hernandez v. Great Am. Ins. Co. of N. Y., 464 S.W.2d 91, 94 (Tex. 1971) (Reavley, J.)).

[50] 593 S.E.2d at 326.

reasoned that "adherence to a payment rule would vest the aggrieved client with the power to forestall the running of the statute of limitations by the deferral of payment, regardless of whether he has already suffered damages sufficient to give rise to his cause of action."[51]  The court also recognized that

> [t]here is little remote, speculative, or contingent about a money judgment. Indeed, it is a legal creature of singular dignity. Such a judgment calls into existence what did not exist before, viz., a liquidated debt. Except for jurisdictional defect, that judgment and the debt it creates cannot be collaterally attacked and is actionable in every state. The recorded judgment constitutes a continuing lien (securing the debt and the interest as it accrues) on the debtor's assets (presently owned and later acquired), a lien that is enforceable by public sale. Subject to the statute of limitations, the debt survives the debtor's death and may be revived against his personal representative.[52]

We agree with the reasoning of these cases and add to it the reasoning behind the more general policy issue addressed by Stanley, i.e., that the viability of a legal malpractice claim should not depend on the ability of the victim to satisfy all or part of a judgment against him.  We do not believe that Louisiana would adopt a rule that would require its courts to recognize the legal malpractice cause of action of a solvent claimant but reject an otherwise identical action brought by a claimant forced by that very malpractice to seek bankruptcy protection.  Such a rule would produce anomalous results

---

[51] Id.

[52] Id.

contradictory to Louisiana's basic interests in tort deterrence and fair application of its laws.

Accordingly, we hold that, at the time bankruptcy proceedings commenced, Hale had incurred a legal injury —— in the form of an adverse money judgment —— sufficient to allow Stanley to assert a legal malpractice claim against the Trinchard defendants on behalf of Hale's bankruptcy estate and that Hale's subsequent discharge from personal liability for that judgment had no effect on the right and duty of the trustee to pursue that claim. The district court erred, therefore, in dismissing Stanley's legal malpractice claim against the Trinchard defendants based on its flawed conclusion that Hale suffered no compensable injury.

Undeterred, the Trinchard defendants also contend that Stanley, as trustee, cannot maintain a legal malpractice claim against them because he never entered into an attorney-client relationship with the Trinchard firm, and legal malpractice actions are not assignable in Louisiana. This is an argument that was credited by the Michigan Bankruptcy Court in McClarty.[53] Stanley counters that federal bankruptcy law —— specifically, placing the trustee in the shoes of the debtor —— trumps state laws prohibiting the assignment of legal malpractice claims. We agree.

---

[53] 176 B.R. at 790 n.2.

We are not sanguine that a bankruptcy trustee is even an assignee within the contemplation of state laws, like Louisiana's, that prohibit assignment of legal malpractice claims. But even if we assume arguendo that the State's anti-assignment law would cover the trustee in bankruptcy, that state rule would not prevail. "It has long been established that federal bankruptcy law determines the scope of a debtor's bankruptcy estate."[54] As noted earlier, the bankruptcy estate includes any "causes of action belonging to the debtor at the time the [bankruptcy] case is commenced."[55] In Segerstrom we stated that

> state law determines only whether a cause of action accrued to the debtor as of the commencement of the bankruptcy case. Once that determination has been made, federal law controls whether a trustee can maintain the cause of action on behalf of the bankruptcy estate. Federal law provides that when a legal malpractice cause of action has accrued to a debtor as of the commencement of the bankruptcy case, it becomes part of the debtor's bankruptcy estate.[56]

We then held that, "[s]ince [the defendant] has provided no tenable basis in federal law for withholding [the debtor's] legal malpractice claim from her bankruptcy estate, we conclude that the estate can pursue the claim."[57] Several other circuits have held that "state laws restricting the transfer or assignment

---

[54] Segerstrom, 247 F.3d at 223.

[55] Id. at 223-24.

[56] Id. at 224 (emphasis in original).

[57] Id. (emphasis added).

of property, including causes of action and personal injury claims, do not preclude the property from passing to the bankrupt's estate under [11 U.S.C.] § 541."[58] Any Louisiana restriction on the assignment of legal malpractice claims is ineffectual to prevent Stanley from pursuing Hale's legal malpractice claim on behalf of his bankruptcy estate.

The Trinchard defendants also urge that the decision of Stanley as trustee and Burge as Hale's judgment creditor not to object to Hale's discharge constituted waivers of any claims that they would have against the Trinchard defendants. They note that, under 11 U.S.C. § 727(c)(1), the trustee or any creditor may object to a debtor's discharge, but neither Stanley nor Burge did so. The Trinchard defendants insist that neither Stanley nor Burge had any intention of pursuing Hale personally for the judgment debt, deciding instead to use Hale's involuntary bankruptcy to pursue their "true target," the Trinchard defendants. This argument is imaginative but nonetheless unavailing: The Trinchard defendants cite no authority —— and we have found none —— for the proposition that a trustee or creditor who fails to object to a debtor's discharge somehow waives the bankruptcy estate's claims against third parties. After

---

[58] See, e.g., Integrated Solutions, Inc. v. Serv. Support Specialists, Inc., 124 F.3d 487, 491 (3d Cir. 1997) ("state laws restricting the transfer or assignment of property, including causes of action and personal injury claims, do not preclude the property from passing to the bankrupt's estate under § 541"); In re Cottrell, 876 F.2d 540, 542-43 (6th Cir. 1989); Sierra Switchboard Co. v. Westinghouse Electric Corp., 789 F.2d 705, 709 (9th Cir. 1986).

all, discharge is greatly favored, and the law is not so perverse as to require a trustee or a creditor to object to discharge or risk the loss of a claim that belongs to the estate.

B.      Breach of the Duty of Good Faith and Fair Dealing

1.      Standard of Review

A district court's summary judgment ruling is reviewed de novo, applying the same standard as the district court.[59]

2.      Merits

In granting summary judgment in favor of NNIC, the district court concluded that Stanley failed to create a genuine issue of material fact whether NNIC breached its duty of good faith and fair dealing, as defined by Louisiana law.[60]  Stanley contends that the district court erred by treating the specific violations of the insurer's duty of good faith and fair dealing enumerated in La. R.S. 22:1220(B) as the exclusive source of an insurer's liability for damages resulting from a breach of that duty.

La. R.S. 22:1220 states, in pertinent part:

---

[59] Curtera, 429 F.3d at 110.

[60] The district court also referenced, as an alternative basis for its ruling, its earlier determination (in the legal malpractice context) that Hale had suffered no damage as a result of the adverse judgment against him.  We reject that ground for the court's grant of summary judgment for the same reasons given above.

(A) An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

(B) Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:

    (1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.

    (2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.

    (3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.

    (4) Misleading a claimant as to the applicable prescriptive period.

    (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.[61]

In Theriot v. Midland Risk Ins. Co., the Louisiana Supreme Court concluded that the first sentence of section (A) "recognizes the jurisprudentially established duty of good faith and fair dealing owed to the insured, which is an outgrowth of the contractual and fiduciary relationship between the insured and

---

[61] La. R.S. 22:1220.

insurer," and that "the second sentence . . . by its plain wording, applies to both insureds and 'claimants.'"[62]  The court reasoned that this distinction between "insureds" and "claimants" indicates the statute's purpose to create a right of action for third-party claimants against insurers for breach of the duty of good faith or fair dealing.[63]  At the conclusion of its extensive analysis, the Theriot court ruled that, even though "a cause of action directly in favor of a third-party claimant against a tort-feasor's insurer is not generally recognized absent statutory creation," La. R.S. 22:1220(B) "create[s] certain limited causes of action in favor of third-party claimants that derogate from established rules of insurance law."[64]  The Theriot court took pains to make clear that "[i]t is the relationship of the parties that gives rise to the implied covenant of good faith and fair dealing" between the insurer and insured.[65]  Inasmuch as it is not the statute that creates the insured's cause of action against the insurer, the bases for an insured's cause of action for a breach of the implied covenant of good faith and fair dealing are not limited to the prohibited acts listed in La. R.S. 22:1220(B).[66]

---

[62] Theriot v. Midland Risk Ins. Co., 694 So.2d 184, 188 (La. 1997) (emphasis added).

[63] Id. at 187-88.

[64] Id. at 193.

[65] Id.

[66] See id.

In this case, NNIC is the debtor's insurer, and Stanley, as bankruptcy trustee, stands in the shoes of NNIC's insured.[67] As Stanley is thus not a third-party claimant against NNIC, his cause of action against NNIC for breach of the covenant of good faith and fair dealing is not limited by La. R.S. 22:1220(B). The district court nevertheless rejected Stanley's claim, because he did not allege that NNIC engaged in any activity specifically proscribed by La. R.S. 22:1220(B). In so doing, the district court applied Theriot's holding (which was expressly limited to actions by third-party claimants) that "only the commission of the specific acts listed in La. R.S. 22:1220(B) can support a private cause of action for breach of the statute" to reject Stanley's claim, which the court determined did not involve allegations of any such conduct.

NNIC contends that the district court did not base its ruling on the fact Stanley failed to allege conduct specifically proscribed by La. R.S. 22:1220(B). NNIC insists that the district court recognized that Stanley's claims were not limited by the list in La. R.S. 1220(B) when that court stated that "Stanley has not identified any jurisprudence that imposes these duties on an insurer." As this statement in the district court's order appears in the context of a discussion of the specific duties imposed by the statute and is followed by the court's analysis of whether Stanley's allegations are encompassed by the statute's

---

[67] See Segerstrom, 247 F.3d at 224 ("When a trustee prosecutes a right of action derived from the debtor, the trustee stands in the shoes of the debtor.").

31

specific prohibition of "misrepresenting pertinent facts or insurance policy provisions," we regard the statement as less than compelling indicia of the court's recognition that a breach of good faith and fair dealing claim by an insured is not circumscribed by La. R.S. 1220(B). Satisfied that dismissal was based solely on Stanley's failure to allege conduct specifically proscribed by La. R.S. 22:1220(B), we hold that the district court erred in dismissing his claim against NNIC.

We do not end our inquiry here, however. We "may affirm summary judgment on any legal ground raised below, even if it was not the basis for the district court's decision."[68] We must therefore determine whether —— La. R.S. 22:1220(B) notwithstanding —— the duty of good faith and fair dealing imposed by Louisiana law, including its jurisprudence, is violated by the conduct alleged by Stanley in this case.

Stanley contends that Louisiana's implied covenant of good faith and fair dealing does make actionable NNIC's conduct, as alleged in his complaint. Stanley's complaint lists ten specific acts by NNIC that purportedly violated the duty of good faith and fair dealing. The first five acts alleged involve NNIC's failure to provide adequate representation to Hale in the Burge litigation,

---

[68] Performance Autoplex II Ltd. v. Mid-Continent Cas. Co., 322 F.3d 847, 853 (5th Cir. 2003).

32

"untainted by conflicts of interest and ethical breaches" created by the Trinchard defendants' joint representation of Hale, the Sheriff, and NNIC.[69]

NNIC insists that it has no legal duty to prevent an attorney's malpractice or monitor possible conflicts of interest. Indeed, Segerstrom seems to support this position. In Segerstrom, as here, a Chapter 7 trustee brought a claim of legal malpractice against the debtor's attorney and a claim of breach of fiduciary duty against the debtor's insurer.[70] The claim against the insurer was based on the attorney's "alleged conflict of interest in representing all three defendants."[71] We affirmed summary judgment in favor of the insurer, stating

> Even assuming that [the attorney's] representation of all three defendants in the [] litigation created a conflict of interests, [the trustee] points to no authority in Texas law suggesting that an insurer's duty of reasonable care requires the insurer to independently identify conflicts and take steps to address them prior to or at the same time as appointing legal counsel.[72]

Likewise, Stanley has pointed to no Louisiana law suggesting such a duty should apply to NNIC in this case.

---

[69] One of the factual disputes underlying Stanley's malpractice action is whether, even after NNIC retained separate counsel to represent its own interests, the Trinchard defendants continued to pursue NNIC's best interests over Hale's.

[70] 247 F.3d at 221.

[71] Id. at 227.

[72] Id. at 228.

Stanley's complaint also alleges that NNIC breached its fiduciary duty of good faith and fair dealing by settling the Burge litigation for (what NNIC contends are the) policy limits, without negotiating a full release for Hale. This duty clearly exists in Louisiana law. The Louisiana Supreme Court has stated that "any payment of the policy limits which does not release the insured from a pending claim . . . even if sufficient to terminate the duty to defend under the wording of the policy involved, raises serious questions as to whether the insurer has discharged its policy obligations in good faith."[73] NNIC does not dispute the existence of this duty; rather it contends that the Burge settlement released Hale from all claims covered by the ADIC policy.

Obviously, the parties' disagreement on this issue is intertwined with their unresolved factual disputes over the ADIC policy limits and coverage period.[74] As noted earlier, the district court concluded —— and we agree —— that genuine issues of material fact exist regarding these disputes. As any determination whether NNIC breached its duty of good faith and fair dealing thus depends on first resolving these fact issues, the district court erred in dismissing, at the summary judgment stage, Stanley's claim based on NNIC's purportedly bad-faith settlement conduct.

---

[73] Pareti v. Sentry Indemnity Co., 536 So.2d 417, 424 (La. 1988).

[74] See supra notes 6-8 and accompanying text.

Stanley also contends that NNIC breached its fiduciary duty of good faith and fair dealing by failing "to truthfully and accurately communicate essential information" to Hale, especially regarding coverage and limits under the ADIC policy. Stanley insists that NNIC failed to provide Hale with important information about settlement offers from Burge and withheld the facts about the ADIC policy limits and coverage period. NNIC again insists that there were no misrepresentations or actionable omissions, because the policy did not cover Hale's conduct after 1983 and had a $100,000 limit during his employment with the Sheriff's Office. The district court determined that Stanley did not produce any evidence to support his allegation. The court observed that both Stanley's complaint and his opposition to NNIC's motion for summary judgment acknowledged that the temporal and monetary scope of the insurance policy was "hotly contested" during the underlying Burge trial. And NNIC points out that Hale stated in his deposition that both Burge's attorney and Clare Trinchard had informed him, well before the settlement, about the dispute over the monetary limits of the policy.

Hale also stated in his deposition, however, that (1) he was never told about the potential for $1,000,000 in coverage, and (2) he was assured by the Trinchard defendants that the Burge settlement would satisfy all of Burge's demands for compensatory damages, including any related to Hale's actions

35

after the expiration of the ADIC policy in 1983. Hale testified that he believed that the settlement and release that he signed was the "end of the road," because he thought the Burge trial would involve only punitive damages which, the Trinchard defendants told him, Burge was unlikely to recover. Moreover, the release signed by Hale in favor of NNIC states that Hale acknowledges that "Burge has reserved the right to pursue punitive damages," but the Burge settlement itself states that Burge "specifically reserves his rights to proceed against the Sheriff and Hale for any and all damages . . . for tortious conduct and damage which occurred and arises after September 1, 1983." Hale insists that he never saw the Burge settlement before signing the release in favor of NNIC.

In light of the parties' competing and untested factual allegations, we are satisfied that material fact issues remain. This precludes summary judgment dismissal of Stanley's claim based on NNIC's purported bad-faith misrepresentation or nondisclosure to Hale of essential information concerning the Burge settlement.

NNIC presents on appeal several additional arguments supporting summary judgment in its favor. These arguments were raised in the district court, but the court did not rule on them. First, NNIC contends that Stanley's claim against it is extinguished by the doctrine of confusion. NNIC argues that, despite Stanley's nominal position as representative of Hale's bankruptcy estate,

36

he is merely a conduit for Burge, because Burge is the only creditor to the bankruptcy estate.[75] As a part of the Burge settlement, Burge signed a Receipt and Indemnification in which he promised to hold harmless and defend NNIC from any and all claims asserted against it in connection with the Burge litigation. Article 1903 of the Louisiana Civil Code states that "[w]hen qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion." In essence, NNIC is contending that Burge, through Stanley, is pursuing a claim that he is obligated to defend, thereby extinguishing that claim. Simply put, NNIC's attempt to stretch the doctrine of extinction by confusion to reach the facts of this case is strained at best. Moreover, NNIC provides no authority for its novel contention that confusion can occur through the actions of a third-party bankruptcy trustee.

NNIC next contends that Stanley's claim against it for breach of its duty of good faith and fair dealing warrants dismissal, because Hale signed an agreement releasing NNIC from "any and all liability" under the ADIC policies, including "claims for indemnification, defense, legal fees and costs, [and] bad faith." NNIC insists that this release meets the requirements of article 3071 of the Louisiana Civil Code for "transaction or compromise," and that neither Hale nor Stanley has sought to rescind it. The Louisiana Supreme Court has long

---

[75] Stanley concedes that, aside from his retained counsel's claim for fees, Burge is the only significant creditor of Hale's bankruptcy estate.

recognized that "Article 3078 of the [Louisiana] Civil Code provides that voluntary compromise agreements, lawfully consummated have the force of a definite judgment in such transactions."[76]  It is equally well-settled, however, that even facially valid releases "may be upset by vices of consent consisting of error, fraud, violence and threats."[77]

The Louisiana Civil Code provides that, "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."[78] "Fraud may also result from silence or inaction."[79] "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent."[80] "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill."[81] Nevertheless, "this exception does not apply when a relation of confidence has

---

[76] Moak v. American Auto. Ins. Co., 134 So.2d 911, 915 (La. 1961).

[77] Id.; La. Civ. Code art. 3079.

[78] La. Civ. Code art. 1953; Shelton v. Standard/700 Associates, 798 So.2d 60, 64 (La. 2001).

[79] Id.

[80] La. Civ. Code art. 1955.

[81] La. Civ. Code art. 1954.

reasonably induced a party to rely on the other's assertions or representations."[82]

"Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence."[83]

NNIC correctly notes that Stanley has not sought to rescind the release Hale executed in favor of NNIC, nor has he directly alleged that Hale was fraudulently induced to sign that release. We are satisfied, however, that those arguments are implicit in Stanley's discrete allegations of the acts and omissions of NNIC that are advanced as proving that NNIC breached its duty of good faith and fair dealing. As detailed above, Stanley contends that, in obtaining Hale's consent to the Burge settlement and the accompanying release in favor of NNIC, NNIC failed "to truthfully and accurately communicate essential information" about the ADIC policy limits and coverage period as well as the true extent of the liability he would continue to face after the Burge settlement was reached. We express no opinion whether NNIC's actions amounted to fraud, but we recognize that Stanley has effectively —— albeit indirectly —— alleged such fraud in the inducement of Hale's consent to the release in favor of NNIC. We therefore decline NNIC's invitation to affirm the district court's grant of

---

[82] Id.

[83] La. Civ. Code art. 1957.

summary judgment based on that release, leaving the ultimate determination of this issue to be made first by the district court on remand.

## III.  CONCLUSION

For the foregoing reasons, we REVERSE the orders of the district court granting summary judgment, one in favor of the Trinchard defendants on Stanley's legal malpractice claim and the other in favor of NNIC on Stanley's claim for breach of good faith and fair dealing; and we REMAND this action to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.